Lawrence Crawford Assoc., etc. v. Conversouce & Phoenix Leasing Systems May it please the Court. I'm Fairfax Jones. I'm from St. Louis. I represent Conversouce. I've been admitted to this case for a lot of years. Now this case, we have to look, what is the standard of review? And the real issue is, was the judgment of the trial court against the manifest weight of the evidence? In other words, when the findings of the trial court are reasonably arbitrary, that means they're against the manifest weight of the evidence. Any legal questions, the Court will try to know. Now, the trial court found, on the bottom of page 2, very interesting in its opinion, it found that Cortek, the manufacturer of the cork gutter, did not deliver the machine within a reasonable time. I think we can all agree on that. Cortek was late. The judgment for lost profits was founded on the testimony, according to the trial court, of Randy Birch. Mr. Birch was the production manager at Lawrence Crawford. Keith Jones, who was in charge of production at Datamax, and Arnold Herman, who became the CFO at Lawrence Crawford about a year after all the events in this case. The court did not consider the testimony of, or didn't say the testimony of, Ken Williams. Ken Williams was the production manager starting about September 1st, about the time Conversouce was supposed to agree to the contract. He's the guy in charge of production at that point on. And the court didn't consider the evidence that Lawrence Crawford canceled the purchase order. Conversouce's purchase order to Cortek, Lawrence Crawford canceled it. The lynchpin of Lawrence Crawford's claim in the court's judgment is that Conversouce breached a promise it never made to deliver the core cutter within 12 to 14 weeks from the date it was ordered. The court found it was a finance lease. Well, I can tell you there are certain requirements of a finance lease, and one of the requirements is that the deal, contract, between Phoenix and Conversouce, they had to be agreed to in advance. It wasn't cut. The lease was signed in late May. The deal between Conversouce and Phoenix doesn't occur for 10 days, 10 days later. So that element was not satisfied. The trial court found that the essence of the contract, and it uses those words, is Exhibit 17 and 17A. That's the purchase order by Phoenix to Conversouce and Conversouce's response, invoice. They just wrote on it and sent it back. Nothing in those key documents refers to when the machine is going to be delivered. Conversouce sent a purchase order to Cortek and received an invoice back. No mention of when the machine is going to be delivered. The court then there was, there is some evidence about who's going to be the supplier, and these are documents traded between Phoenix and Large Properties. In the lease agreement, it identifies on Exhibit A that Conversouce is going to be the supplier. Conversouce never agreed to that, to that terminology. Then it's also in the delivery guarantee, which is an amazing document, Judge. It never guarantees delivery at all. All that really is is a schedule of when payments are to be made. There's no statement in there at all as to when the machine is going to be delivered, and Conversouce is not a party to even giving these documents before the transaction. But Large Profit knew all along that Cortek was going to be the supplier. All you've got to do is go back and look at their credit application, which is Exhibit 4, and that's where it's described. Conversouce, under a finance lease, promises made by Conversouce, those come on down to Large Profit through Phoenix. Any promise they make. And the same would hold true for Cortek. Any promise. So what we've got to do is find out who promised when the machine was going to be delivered. When you go back to Mr. Birch in the summer, he calls up Mr. Sheets. Mr. Sheets says, Go ahead, Mr. President. Because they had a bad experience with Cortek. Because they bought another machine from him, and they were late in delivering. So he calls him up and says, Well, when are you going to deliver this machine? And Mr. Sheets says, Well, we're going to shoot for six weeks. Okay? Then we go along to about the 1st of September. And at that point, Mr. Birch has already talked to Mr. Sheets again, and he finds out, Well, they're robbing Peter to pay Paul. So they know, back in September, they know they're robbing Peter to pay Paul, and they know it's Cortek's in trouble. Well, here we come around about September 24, and Cortek's asking for more money. We need more money to get this thing done. We're in financial difficulty. And it's all in the exhibits. And so that's Exhibit 23. But they need a new delivery guarantee. So they're going to amend that. And Lawrence Crocker does. And you'll notice on there, Eleanor Laswell, who is the executive director, she takes that delivery guarantee. She already knows there's a problem with late delivery. And she crosses something out on there about paying $100. She doesn't write on there, By the way, we're giving you this extra $8,000, but we want that machine in 10 to 14 weeks, or anything like that. She doesn't do that. And more telling is way back when the lease was signed, Lawrence Crawford sends a purchase order directly to Congress source for the machine. Then they decide to do the lease purchase. No request for when the machine is to be delivered. It's right on there. When do you want it? It's right on there for them. Blank. Then we have, that was on September the 25th, and Cortex says, well, you give us this additional money, we'll have it for you in two weeks. The new delivery guarantee, nothing about it. On October 20th, there's another communication. This time they want another week, as long as the parts come in, as Cortex does. And Cortex promises to go to Phoenix. They bypass Congress, and then they'll go to Lawrence Crawford. Then October 27th, they promise we're going to ship the week of November the 10th. That's Cortex. Then December 4th, we're going to ship three to four days after the 10th. And Lawrence Crawford goes along with all of those requests for additional time. Thus, at least there's one oral communication and at least four promises, all made by Cortex, but they don't come through Congress source. They're not promising us. They're promising Phoenix and Lawrence Crawford. None of the promises were approved by Congress source, and they may have told us after the fact, and it wasn't any of us who even did that. That doesn't make them our promises. Cork did not buy it. You look at the opinion that Congress source made the promise of delivery within a certain period of time. Further, what is reasonable? That's the question of what are commercial standards, and was there a good faith deal between the parties? Well, was there a good faith? I suggest not. Lawrence Crawford went behind our back and canceled that order. They canceled that order less than a month after they contacted Cortex and said, we want to make a change in the order. We want some additional tooling. So in less than a month, they canceled the order. Don't tell us about it. It was error for the trial court to ignore all these incentive to extensions and then backdate the date of breach to September the 3rd. Lawrence Crawford argues in their brief on page 14 that these extensions in no way impact Congress source's obligation under the contract. Our obligation is delivery when it's ready to ship, which is exactly what Cortex said. You pay this money when it's ready to ship. Lawrence Crawford exaggerates when they claim that we adopted Cortex. We know. Mr. Birch, he said Congress source never made a representation of Lawrence Crawford as to when the machine would be delivered. That's in the transcript on page 104. To rely on the quote, there was quotes set way back in April by Cortex and by Congress source. They talked about 12 to 14 weeks. Those were never accepted. Furthermore, if you read the leaks, which is exhibit number eight on page two, it says by signing this lease, this supersedes anything that's gone before. This is going to be the deal. So those quotes, in fact, are somewhere on different machines. That doesn't apply. Now, the argument is, well, shipment must be within a reasonable time. And we say we'll ship it when we're ready, when it's ready to ship. Well, you don't go to the default provision of the code if there is some promise. This is only the default. Mr. Hart testified they had no control over when that machine would be ready. And Mr. Burks, he admitted that, too. He said we, as Congress source was, we were at the mercy of Cortex. So how could we make a promise to deliver within a certain period of time when we're at the mercy of Cortex? Eleanor Laswell, the executive director, she testified it was up to Lawrence Crawford to make arrangements as to when the core cutter would be delivered by Cortex. She said that's on page 548. She doesn't know if Congress source ever made promises to when the machine would be delivered. And what's strangely overlooked is paragraph 3 of the code, which is section 52309. Termination of a contract requires that reasonable notification be received by the other party. That would be us, Congress source. And they never gave us any notice. They just went ahead and canceled it. They didn't give us a chance to remedy the situation at all. Mr. Neal's letter went to Phoenix. It didn't go to Congress source. You've got to look for good faith. Good faith, that's in commercial transactions. That's one of the key things you look for in the code talks about good faith representations. The course of conduct, though, I would suggest to you between Phoenix, Lawrence Crawford, and Cortex, after September 1st, enlarge the period of time within which Cortex could deliver the machine. It enlarged. And for the trial court to go back and say, oh, no, we're going back to that September 3rd date, that just is against all the evidence. Lawrence Crawford is a stopped. They have taken a different position now. Their position now is they've got to go along with what the court says. Oh, no, the breach is back on September 3rd. When they're paying additional money and they're consenting to extensions of time. Cancellation made performance impossible. And there's another section, 2615. And that excuses the seller from performance if there is a supervening cause for, is not nonperformance. Not an intervening one, but a supervening. The situation like I signed a contract, but at the time I signed the contract, impossibility of performance. That's one way. We're talking about something that happened after the contract was signed. The supervening cause. Well, in this case, it was a cancellation by Lawrence Crawford. We had no control over them. That event, we couldn't possibly anticipate that they would do that. They said, well, it's foreseeable that Lawrence Crawford might be late in delivery. Well, sure. They knew that because they'd had a prior problem. They knew about the Rob Peter to pay Paul. They knew about the financial problems of court. That was foreseeable. Congress had had business relations before with Corte. We never had more trouble with them as a supplier than anybody else that Mr. Hart so testified. So when you talk about a supervening cause, that's what you look for. Then they say, well, we've got to give you notice. We should have given them notice that there would be a delay in delivery. Congress was going to do this. Well, I don't know what we're going to tell them. Elrond Laswell knew there would be delivery problems when Corte asked for the second check. Argued that we had to give notice to them, ignore as the facts, when they're agreeing to four extensions. What could we have told Lawrence Crawford that they didn't already know? And to cancel the lease when they were changing the order a couple of weeks before, that's just unconscionable. Now let's go to the issue of lost profits. Under Illinois law, which is very similar to Missouri law, there must be evidence to establish lost profits with a fair degree of probability. You don't have to say exactly how much, but a fair degree. You've got to have a foundation, a basis for projecting lost profits. A business has been established before the breach. Wasn't there a core cutting business that Lawrence Crawford had before the alleged breach? Lost profits can't be based on speculation. A new business, it's going to be very difficult. Lost profits must have been contemplated by the parties at the time the contract was entered into. There is nothing that Lawrence Crawford ever talked to Congress for. And furthermore, the plaintiff, Lawrence Crawford, has to say, well, we lost these lost profits because of your conduct. Not somebody else's. Yours. And that's the Midland case. Court found a testimony of Randy Burch, Keith Jones, and Arnold Herman supporting the award. Now, was there an established business? No, there was not. Although they say in their brief that the business relationship started in 2001, I think that's a typo. I think that's a typo. Because they didn't even buy a manual cork cutter and get it until April or May of 2002. And when they got it, they just did it for internal use. The court found most of the core cutting business was going to Lawrence Crawford before Mr. Burch got started in the competing business in December 2003. That's what the court says on page five. But let's go back and look. This claim isn't borne by the evidence. Mr. Burch testified that Lawrence Crawford acquired the cork cutter in May of 2002. And that Datamax only sporadically in the summer of 2003 placed orders. Sporadically. And this was starting in the summer. Williams and his list is Exhibit 49. He said, well, we cut corks starting July 17th. That's six weeks before the alleged breach. He doesn't say how many, but he says that's when they started cutting for Datamax. You wanted $24,000 for the profit? The trial judge, there's $24,000. Oh, yeah. The lost profits were $24,000. Right. What he does, he says, well, the breach started on September 3rd, and then they go up until the end of February, which is six months. Well, if you do the math, he's done it for seven. The problem with the lost profits is you need a foundation. And Mr. Herman, he gets up on the stand, and he says, I'm assuming, my assumption is that Datamax would send all of our cork cutting business to Lawrence Crawford. That's his basic assumption, which is wrong. I mean, Keith Jones said, well, we'd give them a look. We would give them a shot at it. Things like that. To suggest that they would get all the business was just speculation. According to the court, Mr. Jones said they would get most of the core manufacturing business, not all of them, like Mr. Herman says. According to him, they would get a lot more than they already had. According to the record, Mr. Jones testified that he would give them a shot at it. And that was about it. They claim they were excluded from the market because the only customer they had was Datamax, which was a couple miles away. Well, in fact, they forgot. What they forgot was that Mr. Williams had another customer, Shelby Milley, to cut the forest for, and another one was Tara Hope. And, in fact, with Tara Hope, there were 15 to 20 other companies from whom they could have cut forest. But they made no attempt to go out and try to capture any of that business. The false assumptions are that they would get all the business, but Mr. Birch said it would be speculative to try to predict how much business Datamax would give. He said it would be speculative to rely on the core ordering guide. The core ordering guide is not an ordering guide at all. It just tells Datamax, it's an internal document, how many cores they use during a particular period. It's not a guide of how many they're going to buy in the future. He said, Birch said, that Datamax, according to him talking to Keith Jones, was they would be given the opportunity if they had a better price, something our department never had. Mr. Jones said they had to have a competitive price. He said reliance on the guide would be speculative. He wanted a supplier who could cut all the silos. Lawrence Crawford couldn't do it. Birch had a better price and made a sales call. He told them, I've got more machines. I can do this volume. I've got the personnel. No, Lawrence Crawford never did that. Datamax stopped buying from Lawrence Crawford, according to Mr. Jones, because it couldn't keep up with the demand and the price. Even he went on and said if Quirk Tech had the machine arrived on time, the amount of business that they would have given would have been speculative. That's on page 707 of the transcript. Ken Williams, he testified that during the fall of 2003, they were very busy cutting cores. Ken lost it. They were very busy. They lost the one-inch core cutting business because they couldn't meet specifications. They couldn't cut the cores right. They didn't have sharp knives. Does that mean I stop or I've got five more minutes? That's it. That's it. That's it. You can finish your sentence. Well, there's a lot more, but I'll stop for five minutes. Okay. Well, we'll read brief. Don't worry. Okay. Thanks very much. Thank you, Your Honor. May it please the court and counsel, my name is James M. Neal. I'm here on behalf of Lawrence Crawford Association for Accessible Citizens. You were yesterday, too. I'm sorry? You were yesterday, too. I was. By way of background, Lawrence Crawford is a what's commonly known as a sheltered workshop. It provides services for developmentally disabled individuals. There are day services that provide educational programs, but there's also a production side of what Lawrence Crawford does, and that is why we are here today. They involve their clientele with certain types of production activities for which they are paid and for which also provides a source of income for the workshop. Now, what this case is about is a finance lease, which is governed by Article 2A of the Uniform Commercial Code, and it is our position and the trial court found that the transaction involved here was a finance lease for a piece of equipment, which we have been calling a poor cut. Now, a finance lease typically has three parties. There is the lessor, which in this case was Phoenix Leasing Systems, a co-defendant. There is the lessee, which is my client, Lawrence Crawford, and the third party is the supplier of that equipment, and the trial court found in this case that Converse Source, the co-defendant, was a supplier, and we believe the evidence presented at trial supports that finding and was not against the manifest weight of the evidence. Now, first of all, there is a contention made by Converse Source that this was not a finance lease. We cite in our brief Section 2A-103G of the UCC, which sets forth the standard by which a determination is made as to whether a finance lease exists, and here we think the evidence readily supports the trial court's finding that those guidelines were met. That is to say, Phoenix Leasing did not select the supplier or the manufacturer of this poor cutter. That was Lawrence Crawford. Phoenix purchased the poor cutter in connection with this lease. That is uncontested. Finally, Lawrence Crawford received both the purchase order and the invoice that took place between Phoenix and Converse Source, and there was specific language in the lease agreement, which is a part of the trial record, in which they acknowledge that much. And so the evidence supports the finding by the trial court that what we're talking about here is a finance lease. Now, Converse Source argues that they were not the supplier, rather that it was Cortek that was the supplier. It is uncontested that this other party, not a part of this suit, this other entity, Cortek, manufactured the poor cutter. But if you look at the documents here, it is plain that Converse Source was the supplier. Now, Section 2A-103X of the Uniform Commercial Code defines what a supplier is, and it is the entity that supplies or from whom the equipment is purchased. Now, if you look at all the documents here, beginning with the lease itself, Converse Source is identified as the seller of the equipment. Converse Source is identified on all the other supporting documents between Phoenix and Lawrence Crawford that it is the vendor of the equipment. There was a separate purchase order submitted by Lawrence Crawford to Converse Source. Converse Source was the supplier or the agent for the manufacturer. All of those things, which are in the record and which was considered by the trial court, clearly established that Cortek was indeed the manufacturer of this particular piece of equipment, but it was not a party to this transaction. That is to say, Phoenix did not submit a purchase order to Cortek. It submitted a purchase order to Converse Source, and Converse Source held itself out as a representative of Cortek. One of the first exhibits admitted was the sales brochure for this particular piece of equipment that was issued not by Cortek, but by Converse Source. In fact, if you look at that sales brochure, it doesn't say a core cutting machine manufactured by Cortek. The name Cortek doesn't even appear on the brochure. It is a Converse Source product, and Converse Source held itself out and advertised that particular piece of equipment as a Converse Source product. Cortek's name doesn't even appear on those materials. Now, as the supplier under this three-party transaction under Section 2A-209 of the UCC, Lawrence Crawford received the benefit of Converse Source's promises to Phoenix. Now, I would characterize the lease agreement between Phoenix and Lawrence Crawford as a typical boilerplate lease agreement written by Phoenix to do anything and everything it can to protect itself from any liability. However, there is specific language in that particular lease agreement that gives to Lawrence Crawford the right to pursue any remedy it might have against the supplier of that equipment. That is to say, the contract that was entered into between Phoenix and Converse Source under Section 2A-209, those rights extend to the benefit of Lawrence Crawford. And one of those obligations is timely delivery. Now, as was brought out during the course of the trial, you can look at the documentation that was exchanged between Phoenix Leasing and Converse Source in regard to the purchase of this equipment. Phoenix submitted a separate purchase order to Converse Source for the purchase of the core cutter. Converse Source accepted that purchase order and issued an invoice to Phoenix. Now, at that point in time, there were no disclaimers by Converse Source as to what its obligations might be or any limitations to that obligation. Converse Source was well aware that they were providing this equipment to Phoenix from a manufacturer known as Cortec. However, if you look at their material, including their invoice, there is nothing there that says, by the way, our obligation to deliver this equipment is subject to delivery times of the manufacturer, maybe subject to any other circumstance. They had ample opportunity when they know that a product that they are selling is made by someone other than themselves to indicate to that customer, we're going to sell you this piece of equipment, but by the way, we don't manufacture it, and therefore we're not going to be liable if the manufacturer, for example, goes belly up or has a fire or whatever. In other words, there was no subject to. They accepted the purchase order without any type of limitations, and therefore it is their obligation to deliver that equipment and to deliver that equipment in a timely manner. And that was the crux of the problem here. The material that Converse Source submitted directly to Lawrence Crawford indicated a delivery time of 12 to 14 weeks. They did nothing to contradict that at any point in time. Now, that's not to say that that informational brochure constituted a binding contract, and we didn't present that evidence in that light. However, because there was nothing in the lease agreement itself nor the purchase agreement between Converse Source and Phoenix Leasing, you go back to Section 2-3091, which is essentially a codification of the common law, which means that there is an implied obligation to deliver something in a reasonable time. If the contract itself does not expressly state a delivery date, then what is reasonable under the commercial circumstances? And in this particular instance, your honors, Converse Source itself from the get-go was talking about 12 to 14 weeks delivery time. There were representations made by Phoenix and by Cortec, the manufacturer, to Phoenix as to what a reasonable delivery time would be. Randy Birch testified as to what a reasonable delivery time would be for equipment of this nature. Did your client consent to any extensions or request any modifications in the product, you know, in August, September? There were no agreements. There were complaints repeated in regard to the extensions. There were repeated complaints made by Lawrence Crawford to Phoenix Leasing, copied to Converse Source, about non-delivering of this equipment. It's your position you never consented to an extension. No. You always maintained that you wanted immediate delivery? We wanted delivery within a reasonable time, which we deemed to be by August 1. And that was – Randy Birch, who was employed at that time, said based upon the representations that had been made, based upon the representations in the sale brochure, the kind of equipment involved, that piece – it should have been delivered by August 1. Did you request any modifications? No. What he is referring to there, there was an inquiry made by Mr. Williams to Corotek directly concerning some additional tooling for it. But there was never – and this is reflected in the testimony of Al Kellner last week – there was never any change requested of the manufacturer directly that would impact it or change how that machine was being built for additional tooling. It had nothing to do with the machine itself or materials. What did it have to do with? It had to do with different – in other words, the automatic core cutter. There was an inquiry made at Corotek about getting additional cutting sizes that you could insert into the machine. In other words, that would be separate from the machine itself. In other words, if you want to cut different widths of cores, there was an inquiry made in that regard. But there was never any request or order submitted to Corotek directly saying, wait a minute, we want to change the parameters or the specifications of this machine. Nothing like that. And the record doesn't reflect that. So by that point in time, frankly, I think the evidence shows it was clear that Corotek was not going to make a machine. This was in – I think that inquiry was made in December, I believe. But there was never any consent. In other words, there was never any modification of the agreement saying, okay, we agree that you have up until this time. There were simply representations made by the manufacturer addressed to Phoenix and again copied to Commerce Source saying, you know, just give us a few more weeks, we'll get this machine to you. Well, that continued through September. It continued through October. It continued through November. And as counsel has indicated, there was a time where they requested additional funds. Well, Lawrence Crawford thought, you know, it's going to change the payment schedule. Well, Lawrence Crawford made the judgment call, well, if we're going to have to pay him some more money up front to get this machine delivered, we'll do it. Well, alas, that didn't produce a machine either. So come January, it was clear no machine was going to be delivered. There had never been issued by Commerce Source to Phoenix a notice ready to ship. Nothing like that. And it was clear that is seven months after the lease agreement was entered into. Seven months had passed, and there had never been a notice to ship or an indication by Phoenix, by Commerce Source, that we got a machine ready to ship you. And there was no evidence presented that that machine ever was completed. So it's our position, Your Honor, that based upon the evidence that was presented as to the kind of equipment involved here, the representations initially by Commerce Source and Phoenix and the manufacturers, how much time it would reasonably take to put this machine together and ship it, that seven months was more than a reasonable time and that a reasonable time had passed by August of 2003. When Lawrence Crawford canceled the lease, they ordered a replacement machine from Appleton Manufacturing. Same kind of machine, basically performing the same kind of functions. It took four weeks for that machine to be delivered. Only four weeks. It is true. Lawrence Crawford had ordered a manual core cutter from this company before ordering this automatic. That manual core cutter, that's not an issue in this case, but it took about six weeks for that machine to be delivered. So Lawrence Crawford realized that it's not going to be delivered in one week or two weeks, and as the trial record reflects, Mr. Burge and others from the workshop testified, they didn't expect it in four weeks or so, but they did expect it within a reasonable time. The manufacturers said they'd have it to them in six weeks. They say that the brochures say 14, but it was obvious that there were problems here. Obvious. Now, this gets to the point of Congress saying, well, Lawrence Crawford had no right to cancel this lease. It's our position that we did, and the evidence supports the trial court's finding of that. They are trying to use that particular section they cited as a shield from their obligation to make a timely delivery. A party has an absolute right to terminate a contract when it's not been, when the product has not been delivered in a reasonable time, not only to cancel that contract, but to try to mitigate their damages by finding a replacement machine, which is exactly what they did here. Congress argues that there was commercial frustration on its part. That is to say, we couldn't, we could not meet our obligations because Lawrence Crawford canceled the lease. Well, again, they were justified in canceling the lease. Moreover, for commercial frustration to fly as an argument here, it has to be something that was unforeseeable that occurred. Now, CommerSource is a national company marketing products all over this continent. It was certainly foreseeable to them that a product that they had promised to provide to a customer, which they did not manufacture, might have, there might be problems in delivery. It was certainly foreseeable for them to protect themselves, and that gets this segue somewhat into my previous argument. They certainly had opportunity to protect themselves from the situation they find themselves in here. They simply could have said, we are not responsible for the manufacturer's delay. They chose not to do that. They held themselves out as a representative of Cortec that they provide this product, and that was it. So they are held to the same standard as anyone else would be, as Cortec would have been. And so not having taken advantage of their opportunity to limit their liability, they are in fact liable under 2A209 to Lawrence Crawford as the lessee. Now, CommerSource here today is challenging that portion of the trial courts of war that is based on lost products. And on this particular element, we have to keep in mind, first of all, there was an existing business relationship between Lawrence Crawford and this company known as Database. Though we deal more with lost products here, it is tied to one particular customer, Database. And Lawrence Crawford had an existing business relationship with them even prior to the time that they provided core cutting using their manual core cutter. They had done labeling different kinds of what I would call minor production activities for Database. Then they purchased this manual core cutter and did a limited amount of core cutting for Datamax in 2002. Then they, at that point, under the testimony of Randy Birch, indicates this. There was discussion between him and Heath Jones, who was the production manager, later the plant manager for Datamax, that they would get this business. He provided them an ordering guide, which he testified to would be a reliable guide to provide calculations for determining how much business you could acquire from Datamax. And contrary to counsel's argument, he specifically said, I'm the one that makes the decision as to who gets business here. And I told Lawrence Crawford that if they got the necessary equipment, we would give them the core cutting business. He says that, and that's in the trial record. Mr. Herman testified as to the calculations to determine lost profits. I would point out to you, Lawrence, that Congress source provided no expert witness of its own in regard to determination of whether or not there were lost profits here. The only testimony that they offered was that of Randy Birch. And under an offer of proof, Mr. Birch testified as to the factors that he looks at in determining what are proper expenses in determining lost profits. Mr. Birch's company had a completely different business model than Lawrence Crawford's. That is to say, Lawrence Crawford, and this is set out in our brief, Mr. Herman testified at length as to why some things were factored into his determination of what should be a properly calculated lost profit. Thank you. Mr. Jones, you do have five minutes of rebuttal, but you still don't get a notice. You start whenever you're ready. Back on the issue of lost profits, I'll be very brief. Mr. Herman first testified the lost profits were $41,000. He came back a month later and said, well, you know, I better take into account the cost of the shipping boxes and fuel for the delivery truck. And his lost profits went from $41,000 to $25,000 per year. And then he came back. Then we said, well, wait a minute. There are all kinds of other expenses you didn't take into account. You're saying you lost all this business. Actually, he comes back a third time and says, well, we really only lost the three-inch core cutting business because we had a machine to make the one-inch cores. So then he comes back and gives the judge a new figure, $15,000. But the judge ignores all that. And when you look at his calculations, he says, well, we'd have a different business model. You show me a case. You show me a case that says a not-for-profit corporation who's out to make a profit is not required to take into account and to get to the bottom line supervisory, management costs, utilities, all of those type of expenses like any normal business was. There's no case. I couldn't find it. Maybe the court can. That says they should be treated special. Now, they keep trying to talk about that quote that came out in April, the 12 to 14 week thing. That was never accepted. It was never acted on. It was not a part of the lease. Those terms are not included in the lease. And Lawrence Crawford had two opportunities, more than that, to say it's going to be 10 to 14 weeks or 12 to 14 weeks. And they sent out a purchase order to Congress for us with no money, by the way. That's where they sued us, first of all. They sued us on a purchase order they sent to us with no money. Now, consideration, you know, is pretty fundamental. But what's important about it is they didn't ask for a delivery date on that document. That's exhibit number seven. The quote wasn't accepted. In fact, it was for a different machine. All the one machine, how much is it going to cost, that was all between Lawrence Crawford and Cortec. That's where the negotiations were going to go on. And I notice there's no explanation given today by Mr. Neal as to why they didn't tell Congress, by the way, we're going to cancel the order as required by the section on reasonable time. That section, he gives no explanation for that. And the change in the order was they wanted to get one-inch tooling. When they ordered this automatic, they only ordered three-inch tooling, not one-inch tooling. And they wanted that. Impossibility performance, again, he says it's foreseeable. How in the world would we foresee that Lawrence Crawford would come in and cancel the order? They said they had a right to. Well, that's their conclusion. That's their conclusion. Acting in good faith, you're going to hold somebody liable. Don't you think, you know, I say, look, can you do something for us? No, they didn't do that. But we're left with about four questions. Who selected the manufacturer? Who had a bad experience with the manufacturer as far as meeting delivery commitment? Who consented for extensions of time to deliver the machine and even paid more money? Who modified the purchase order in December to add additional tooling? Who canceled the order without notice to Congress? Who set the wheels in motion for this disaster? It's Lawrence Crawford. The party who has demonstrated a lack of good faith towards my client, CongressSource, now seeks to be rewarded. Your Honor, I think the trial court should be reversed, especially on this lost proposition. And you can search the record, you can read a whole 800 pages, and you will never find a promise made by CongressSource to Lawrence Crawford as to when the machine would be delivered. Your Honors, thank you very much. Thank you. We appreciate your argument in the brief.